CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED

7/10/2026

LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 5:26-cr-00009 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| CANDY LAZO, | ) | By:    Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

Defendant Candy Lazo ("Defendant" or "Lazo"), who recently pleaded guilty to, and was found guilty of, passport fraud and stealing Social Security disability benefits, moves to revoke the Magistrate Judge's order of detention. (*See* ECF No. 51.) Because Defendant failed to establish, by clear and convincing evidence, that she does not pose a flight risk if released pending sentencing, the court will deny her request.

## I. BACKGROUND

In March 2026, Defendant was arrested on a criminal complaint charging myriad offenses, including passport fraud, immigration fraud, theft of government funds, and aggravated identity theft. (*See* ECF No. 1.) She appeared before Magistrate Judge Joel C. Hoppe on March 27, 2026, for preliminary and detention hearings. (ECF Nos. 16, 17.)

After reviewing numerous exhibits and hearing testimony from the lead investigator and Defendant's daughter,[1] Judge Hoppe found probable cause to support the charges outlined in the criminal complaint and further concluded that no condition, or combination

---

[1] The court has carefully reviewed the transcript of this hearing. The court elected to not hold another hearing because the parties rely on the same evidence that they initially presented to Judge Hoppe, and their legal arguments are adequately set forth in their written briefs.

of conditions, "will reasonably assure the Defendant's presence as required (by a preponderance of the evidence)" if Lazo was released on bond. (ECF No. 25, at 1.) Judge Hoppe noted that, although Defendant had "significant family ties" in Virginia and no criminal history, the abundant evidence presented by the government established that Lazo had falsely assumed someone else's identity since at least 1993, used that stolen identity to unlawfully obtain various identification documents and government benefits, and traveled regularly to and from Mexico. (*Id.*) Accordingly, he ordered that Defendant be detained pending trial. (*Id.* at 2.)

Lazo appeared before Judge Hoppe again on June 17, 2026, for a change-of-plea hearing. (*See* ECF No. 41.) At this hearing, she waived indictment by a grand jury and pleaded guilty to a Bill of Information charging her with passport fraud, in violation of 18 U.S.C. § 1542 (Count One), and theft of government money (specifically, Social Security disability benefits), in violation of 18 U.S.C. § 641 (Count Two). After Judge Hoppe completed the guilty-plea colloquy, *see* Fed. R. Crim. P. 11, Defendant's attorney asked him to reconsider his initial bond denial. (*See* ECF No. 45.) Judge Hoppe considered, but ultimately denied, this second request for bond. In his Report and Recommendation issued later that day, Judge Hoppe recommended that the District Judge accept Lazo's guilty plea and adjudge her guilty. (*See* ECF No. 50, at 3.) He also noted that he had denied bond, for a second time, following the entry of the guilty plea, because "clear and convincing evidence does not exist that the defendant is not likely to flee if released." (*Id.*)

On July 2, 2026, the court entered an order adopting Judge Hoppe's Report and Recommendation that it accept Defendant's guilty pleas, and it adjudged Lazo guilty of Counts One and Two of the Bill of Information. (*See* ECF No. 55.)

## II. STANDARD OF REVIEW

The Bail Reform Act implicitly provides for a presumption of detention for a defendant who has been adjudged guilty of an offense and faces a term of imprisonment. 18 U.S.C. §§ 3141–3156. Under 18 U.S.C. § 3143(a), the court must "order that a person who has been found guilty of an offense and who is awaiting imposition or execution of a [prison] sentence . . . be detained, unless [the court] finds by clear and convincing evidence that [she] is not likely to flee or pose a danger to the safety of any other person or the community. . . ."

## III. ANALYSIS

Defendant argues that this court can set bond conditions that would ameliorate any concerns that she would flee before sentencing.[2] (ECF No. 51, at 7.) In so doing, Defendant entreats the court to consider the circumstances that initially led her to assume a false identity as a teenager nearly four decades ago. (*Id.* at 2–3.) According to Defendant, these unique circumstances help prove that she is not a flight risk. (*Id.* at 7–8.)

By all indications, Defendant, who is a Mexican citizen, was a victim of human trafficking. (*Id.* at 2.) She was brought to the United States when she was 15 by a man who was in his 50s. (*Id.*) This older man, who was already married to a Mexican woman named Natalia Perez, took Defendant from her family's home in Mexico to the United States, where

---

[2] No one has taken the position that this 52-year-old grandmother with no other criminal history poses a danger to the community.

he worked as a migrant laborer. (*Id.* at 2–3.) He instructed Defendant to present herself as his wife (as well as the mother of his and Perez's infant son, who also accompanied him to the United States) and to assume Perez's identity in all other respects while they lived together. (*Id.* at 3.) Over the next 17 years, Defendant remained in a physically and sexually abusive relationship with this older man and had three children with him. (*Id.*) In 2006, the older man was injured on a jobsite and returned to Mexico. (*Id.*) Following their separation, Defendant continued to live in the United States with her children under the name Natalia Perez. (*Id.*) She later used this false identity to obtain immigration benefits, a Social Security number, naturalized U.S. citizenship, multiple passports, and, eventually, Social Security disability benefits.[3] (ECF No. 53, at 2.)

Defendant asserts that, at various times in the past, she attempted to rectify the fact that she was living in the United States under a false identity. (ECF No. 51, at 8–9.) She claims to have consulted lawyers about her conundrum, but they were unable, or unwilling, to assist her. (*Id.*) Defendant further asserts that she applied to become a naturalized U.S. citizen using Perez's identity on the advice of "an advocate for women in abusive situations[,]" and did so without a full understanding or appreciation of the wrongfulness of her actions. (*Id.* at 9.)

Defendant's adult children recently hired an immigration lawyer to help their mother fight the expected effort by U.S. immigration officials to denaturalize and remove her from

---

[3] In 2012, Defendant legally changed her name from Natalia Perez to Candy Lazo. Defendant's fraud only recently came to light because the real Natalia Perez, the older man's actual wife, eventually immigrated to the United States and attempted to renew her lawful residency status. When she did, immigration officials determined that someone else—*i.e.*, Defendant—had already used her identity to obtain U.S. citizenship and various government benefits, including Social Security disability. Because of this, Ms. Perez's prospects for being able to continue to live in the United States are in doubt. (ECF No. 29, at 21:5–8, 47:9–16; ECF No. 53, at 2.)

this country after she serves whatever prison sentence is imposed by this court. (ECF No. 51, at 9.) Defendant argues that the immigration attorney's efforts in this regard will be hampered unless this court releases her on bond so that she can meet regularly with him and prepare for these hearings. (*Id.*) And she submits that any attendant risk that she will flee can be sufficiently mitigated by having her daughter, who is a U.S. citizen of good repute, serve as a third-party bond custodian and subjecting her to GPS monitoring. (*Id.* at 4.)

The Government does not challenge the veracity of Defendant's account of how she initially came to live in the United States, but it argues that these circumstances do not excuse Defendant's later (and multifaceted) fraudulent conduct or otherwise mitigate her risk of flight. (ECF No. 53, at 8–10.) The court agrees.

The circumstances of how Defendant initially came to the United States are undoubtedly tragic. What's more, they may ultimately mitigate in favor of some leniency at her upcoming sentencing. But the narrow question before the court at this stage is whether these circumstances—considered in conjunction with Defendant's longstanding ties to the community, her absence of other criminal history, and her assurances that she would comply with the conditions of bond—establish, by clear and convincing evidence, that she does not pose a risk of flight.

Applying a *de novo* standard of review, *see United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001) (unpublished), the court concludes that they do not. As the Government argues— and the Magistrate Judge correctly found—Defendant, who has lived in the United States for

nearly 40 years, has a strong incentive to flee to avoid continued incarceration.[4] That incentive is further heightened by the fact that she also faces the almost-certain prospect, despite the best efforts of any immigration lawyer, of being denaturalized and deported to Mexico, where she would be permanently separated from her husband, her children, her grandchildren, and the only way of life she has known for several decades.

Moreover, the Government has marshaled considerable evidence establishing that Defendant could flee, if she chose to. (ECF No. 53, at 8–9.) While living under a false identity, Defendant obtained numerous forms of false identification, including a Social Security card, a birth certificate, driver's licenses, a U.S. passport, a U.S. passport card, and a Mexican passport, and she has traveled extensively, both within the United States and to and from Mexico. She also has the financial means to evade capture—at least for a while. At the time of her arrest, government agents recovered several thousand dollars in cash from Defendant's bedroom.[5] (*Id.*) Moreover, Defendant and her husband jointly own a rental property in West Virginia, and their tax returns indicate that they have earned more-than-modest income from various sources over the past several years. (*Id.*) At bottom, Defendant's incentive to flee is particularly acute, and she has the wherewithal and prior experience to act on it. These concerns are not

---

[4] The Government believes that Defendant likely faces an advisory Guidelines range of up to 18 months' imprisonment, and Defendant acknowledges "her worst case scenario is likely to be 8 to 14 months" imprisonment. (*See* ECF No. 51, at 10; ECF No. 53, at 10 n.3.)

[5] As the Magistrate Judge noted, Defendant failed to report these savings on her financial affidavit prior to her initial appearance. (ECF No. 29, at 29:22–30:18.)

ameliorated by Defendant's naked promise that she would abide by the terms and conditions of bond and the utilization of GPS monitoring.[6]

## IV. CONCLUSION

Because Defendant has failed to establish, by clear and convincing evidence, that she is not a flight risk, the court will not release her on bond pending sentencing. Her motion to revoke the Magistrate Judge's bond determination will be denied.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 10th day of July, 2026.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[6] As this court was recently reminded in another criminal case involving a person subject to imminent removal from the United States, these devices are far from foolproof.